# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1993
_____

United States of America

*Plaintiff - Appellee*

v.

Jackie R. Shelledy

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: March 12, 2020
Filed: June 8, 2020

_____

Before GRUENDER, WOLLMAN, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Following a jury trial, Jackie Shelledy was convicted of one count of conspiracy to distribute 50 grams or more of actual methamphetamine, and some amount of hydromorphone and oxycodone, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846, and 851. He was sentenced to 300 months imprisonment. On appeal, Shelledy challenges the sufficiency of the evidence, a jury instruction, and a number

of evidentiary rulings.  Having jurisdiction under 28 U.S.C. § 1291, we affirm the judgment of the district court.[1]

## I.

"We recount the relevant testimony and other evidence presented at trial in the light most favorable to the jury's verdict."  United States v. Shavers, 955 F.3d 685, 688 n.2 (8th Cir. 2020).

Shelledy's convictions arise from his role as a supplier for a methamphetamine distribution scheme operating throughout the Western District of Missouri.  Special Agent Christopher Redies of the Bureau of Alcohol, Tobacco, Firearms and Explosives was involved in the investigation of Teresa Wolfe, one of Shelledy's co-defendants, for distribution of methamphetamine.  As part of his investigation, Redies testified at trial that he made a number of undercover purchases from Wolfe.  During one such purchase, Wolfe told Redies in a recorded conversation that she had switched to a new supplier, later identified as Shelledy.  This change in supplier was confirmed by laboratory testing of the methamphetamine purchased by Redies, which revealed that the later-purchased methamphetamine had a lower purity than the earlier-purchased methamphetamine.  This suggested it had been "cut," or diluted, with another substance, such as dimethyl sulfone, which is commonly known as "MSM."

Wolfe ultimately pleaded guilty to fifteen drug-related charges related to this case and testified at Shelledy's trial that, after having a falling out with her original supplier, Clarence Bradley, she turned to Shelledy as her new supplier.  She further testified that she sold methamphetamine to, and purchased methamphetamine from,

---

[1]The Honorable Roseann A. Ketchmark, United States District Judge for the Western District of Missouri.

Shelledy on a number of occasions. This included her sales of ounce quantities to Shelledy as well as her purchases of quarter-pound amounts of methamphetamine from Shelledy. She also testified that she resold methamphetamine, weighing 112.4 grams, that she obtained from Shelledy to an undercover officer. Finally, Wolfe stated that she also sold hydromorphone, oxycodone, and morphine to Shelledy.

Wolfe's testimony was corroborated by that of Shelledy's indicted co-conspirators and other witnesses. Indeed, another charged co-conspirator, James Smith, testified that he attempted to purchase morphine pills from Shelledy and described an instance in which Shelledy gave him roughly a quarter-pound of methamphetamine, part of which Smith resold to others. Smith also testified that Shelledy fronted him this methamphetamine, meaning that Shelledy would take payment only after Smith had resold it. Smith also described introducing Shelledy to Smith's methamphetamine supplier. During the introduction, Smith's supplier gave a pound of methamphetamine to Shelledy. Other witnesses, including Bradley, Randall Holmes, and Melanie Piers, also testified that they either purchased or sold methamphetamine to Shelledy in varying quantities, or that they assisted Shelledy in purchasing methamphetamine from others. For example, Holmes testified that he helped Shelledy purchase one kilogram of methamphetamine from Holmes's supplier and that Shelledy later distributed part of that methamphetamine to a third party.

The government also presented at trial the text of conversations between Shelledy and other individuals on Facebook and physical evidence obtained from a search warrant that was executed at Shelledy's home following his arrest. The conversations on Facebook made reference to the sales of methamphetamine, hydromorphone, and oxycodone that Shelledy had made or was planning to make. The physical evidence obtained from Shelledy's home included scales; baggies, one of which contained methamphetamine residue; MSM; and a torn piece of paper with the words "quarter pound," "4 ox," and "4 zips," which an agent involved in the investigation testified are all drug-related slang.

The jury returned a guilty verdict as to conspiracy to distribute 50 grams or more of actual methamphetamine and some amount of hydromorphone and oxycodone, as charged in Count 1 of the second superseding indictment. The district court later sentenced Shelledy to 300 months imprisonment.

## II.

Shelledy first challenges the sufficiency of the evidence, arguing that the government failed to show that he conspired with anyone to distribute methamphetamine, hydromorphone, or oxycodone. Instead, he suggests that the government's case showed, at most, only a buyer-seller relationship between him and others. "[W]e will review the sufficiency of the evidence to sustain a conviction de novo, viewing the evidence in the light most favorable to the jury's verdict and reversing the verdict only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Ramos, 852 F.3d 747, 753 (8th Cir. 2017) (internal quotation marks omitted).

To demonstrate that Shelledy conspired to distribute and possess with the intent to distribute methamphetamine, hydromorphone, and oxycodone, the government needed to prove that: (1) there was an agreement between Shelledy and others to distribute and possess with the intent to distribute drugs, (2) Shelledy knew of the conspiracy, and (3) Shelledy intentionally joined the conspiracy. See Shavers, 955 F.3d at 691. We have noted that "[b]ecause conspiracies are often secretive, their existence may be proven through circumstantial evidence alone, and evidence of an agreement to join the conspiracy may be inferred from the facts." Id. (internal citation omitted). Additionally, "a defendant may be convicted for even a minor role in a conspiracy, so long as the government proves beyond a reasonable doubt that he or she was a member of the conspiracy." United States v. Lopez, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc).

-4-

However, "proof of a buyer-seller relationship without more is not sufficient to prove a conspiracy." United States v. Finch, 16 F.3d 228, 231 (8th Cir. 1994). "Because the crime of conspiracy requires a concert of action among two or more persons for a common purpose, the mere agreement of one person to buy what another agrees to sell, standing alone, does not support a conspiracy conviction." United States v. Prieskorn, 658 F.2d 631, 634 (8th Cir. 1981) (quoting United States v. Mancillas, 580 F.2d 1301, 1307 (7th Cir. 1978)). But we have emphasized that such "buyer-seller" cases "involve[] only evidence of a single transient sales agreement and small amounts of drugs consistent with personal use." Id. (internal quotation marks omitted). "[A] reasonable jury can find that a defendant has more than a mere buyer-seller relationship if the evidence supports a finding that they shared a conspiratorial purpose to advance other transfers." United States v. Donnell, 596 F.3d 913, 925 (8th Cir. 2010) (internal quotation marks omitted). And "[w]here the evidence shows multiple transactions involving large amounts of drugs, we have held this is sufficient to support a conclusion that the drugs were purchased for resale." Id.

Contrary to Shelledy's arguments, the evidence presented at trial supports his conviction and clearly demonstrates that this was no mere "buyer-seller" case or that Shelledy was simply sharing drugs with others for personal use. Indeed, multiple witnesses, including co-conspirators Wolfe and Smith, testified that Shelledy had sold to them, or had purchased from them, varying quantities of methamphetamine, including in quarter-pound amounts. The size of some of these transactions, and the frequency with which they occurred, is inconsistent with that of a buyer-seller relationship or with Shelledy's argument that he was simply sharing personal-use quantities with others. Rather, a reasonable jury could infer that Shelledy was distributing and possessing with the intent to distribute from this evidence. See United States v. Schubel, 912 F.2d 952, 956 (8th Cir. 1990) ("Intent to distribute may be inferred solely from the possession of large quantities of narcotics."); cf. United States v. Fang, 844 F.3d 775, 779 (8th Cir. 2016) (holding that 25 grams of

-5-

methamphetamine, with $3,900 in cash and small plastic bags, supports an inference of intent to distribute). Additionally, the jury heard testimony that Shelledy once "fronted" methamphetamine to Smith. Similarly, the testimony from Holmes showed that Holmes helped Shelledy purchase one kilogram of methamphetamine from Holmes's supplier. Holmes testified that Shelledy delivered part of this methamphetamine to a third party. Moreover, Wolfe's testimony also described sales of hydromorphone and oxycodone pills to Shelledy, and Smith's testimony described an attempted purchase of morphine pills from Shelledy. This is also consistent with distribution and possession with the intent to distribute.

The testimony of these witnesses was also corroborated by the physical and other evidence presented at trial. This included items seized from Shelledy's home, such as scales, baggies, a baggie containing methamphetamine residue, and the MSM cutting agent. See Schubel, 912 F.2d at 956 ("The presence of equipment to weigh and measure the narcotics, paraphernalia used to aid in their distribution . . . are common indicia of drug trafficking and are all circumstantial evidence of intent to distribute."). It also included a torn piece of paper found in Shelledy's home with the words "quarter pound," "4 ox," and "4 zips," which are all drug-related slang, and evidence of his conversations on social media that made reference to his completed or planned sales of methamphetamine, hydromorphone, and oxycodone.

From this evidence, a reasonable jury could find beyond a reasonable doubt that Shelledy conspired to distribute or possess with the intent to distribute the drugs at issue. Moreover, evidence that all of the participants in this conspiracy were aware of one another is not necessary to prove a conspiracy. See United States v. Rodriguez-Mendez, 336 F.3d 692, 695 (8th Cir. 2003). Lastly, though Shelledy attacks the credibility of some of the witnesses who testified against him and points out purported contradictions in their testimony, "[c]redibility is a factual determination for the jury to decide." United States v. Mazzulla, 932 F.3d 1091, 1102 (8th Cir. 2019).

Accordingly, we reject Shelledy's sufficiency challenge.

## III.

Next, Shelledy argues that the district court made several erroneous evidentiary rulings. Specifically, he argues that the district court erred by (1) denying his motion in limine to exclude evidence of his affiliation with a gang, (2) permitting the government to introduce evidence of his prior convictions under Fed. R. Evid. 404(b), and (3) limiting his ability to use Fed. R. Evid. 609 evidence to cross examine government witnesses. We review the district court's admission of this evidence for an abuse of discretion. See United States v. Ellison, 616 F.3d 829, 832 (8th Cir. 2010) (motion in limine concerning gang-related evidence); United States v. Ali, 616 F.3d 745, 752 (8th Cir. 2010) (Rule 404(b) evidence); United States v. Wesley, 990 F.2d 360, 366 (8th Cir. 1993) (Rule 609 evidence).

## A.

Shelledy first argues that the district court improperly denied his motion in limine concerning evidence of his affiliation with a gang and erroneously allowed the government to make reference to this affiliation over the course of trial. The government may elicit testimony about the defendant's social or gang membership if it is relevant to a disputed issue in the case. See United States v. Lemon, 239 F.3d 968, 971 (8th Cir. 2001). Such evidence, however, is not admissible if it is offered solely to prejudice the defendant or to make a propensity argument, such as by linking him to "unsavory characters." United States v. McKay, 431 F.3d 1085, 1093 (8th Cir. 2005). We will "reverse only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." United States v. Payne-Owens, 845 F.3d 868, 872 (8th Cir. 2017) (quoting United States v. Brown, 148 F.3d 1003, 1009 (8th Cir. 1998)).

Here, the district court allowed the government to present limited evidence suggesting that Shelledy was a member of a motorcycle club called the "Galloping Goose." At the outset, it is important to note that the government never referred to the group as a "gang"—it consistently called it a "club"—and it did not put on direct evidence that the Galloping Goose or its members were engaged in criminal activity. Instead, the jury was presented with evidence containing only two references to the Galloping Goose and implicit criminality: (1) a recording in which Shelledy instructed his wife to tell the girlfriend of one of Shelledy's co-conspirators that Shelledy was still a member of the Galloping Goose, arguably to intimidate or influence her, and (2) a recording in which Wolfe, an indicted co-conspirator, mentioned that she was a member of "the Gooses" and implied that an undercover officer would be killed if he betrayed Wolfe, seemingly on account of her membership in that group.

Critically, this evidence was not offered to show that Shelledy was associated with "unsavory characters" or to show that he had a propensity to commit criminal acts—rather, this evidence went to actual issues in the case. The recording between Shelledy and his wife was offered to demonstrate consciousness of guilt. See United States v. Chauncey, 420 F.3d 864, 875 (8th Cir. 2005) ("Evidence of a defendant's threat against a [potential] witness is admissible to show consciousness of guilt."). The recording of Wolfe demonstrated her connection with Shelledy, as both were members of the same club, and it provided some context in which the crime occurred. Similarly, any other references to the Galloping Goose were simply to explain how Shelledy knew the other members of the conspiracy. Unlike United States v. Street, in which we found reversible error where the district court permitted extensive testimony "to illustrate the violent, lawless propensities of outlaw motorcycle gangs," the references to the Galloping Goose were limited in scope and were relevant to the issues in the case. 548 F.3d 618, 629 (8th Cir. 2008). Accordingly, we conclude that the district court did not abuse its discretion by denying the motion in limine and admitting this evidence.

-8-

B.

Shelledy next argues that the district court abused its discretion by permitting the government to introduce evidence showing that he had been previously convicted of (1) possession of pseudoephedrine with intent to manufacture methamphetamine, and (2) possession of methamphetamine. Both of these convictions were from 1998.

Evidence of a defendant's prior criminal convictions may, under limited circumstances, be admitted through Rule 404(b)(2) to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." It may not be offered, however, solely to show propensity. See United States v. Thomas, 58 F.3d 1318, 1319 (8th Cir. 1995).

> Evidence of a prior conviction is admissible if (1) it is relevant to a material issue, (2) it is similar in kind and not overly remote in time to the charged offense, (3) it is supported by sufficient evidence, and (4) its potential prejudice does not substantially outweigh its probative value.

United States v. Ellis, 817 F.3d 570, 579 (8th Cir. 2016).

Contrary to Shelledy's arguments, the evidence of his 1998 convictions was offered for a proper purpose and tended to prove an element of the charged offense—namely, his knowledge of, and intent to participate in, a drug conspiracy. Indeed, the government did not offer this evidence to make a propensity argument to the jury, but rather to rebut Shelledy's general denial of the charged offense. In so doing, Shelledy put his mental state into controversy, and the evidence of his prior convictions could be used to show his knowledge of, and intent to participate in, the conspiracy. See Thomas, 58 F.3d at 1322 ("When a defendant raises the issue of mental state, whether by. . . [a] defense that specifically challenges the mental

-9-

element of the government's case or by means of a general denial that forces the government to prove every element of its case, prior bad acts evidence is admissible because mental state is a material issue."); see also United States v. Logan, 121 F.3d 1172, 1178 (8th Cir. 1997) (noting that "prior possession of drugs, even in an amount consistent only with personal use, is admissible to show such things as knowledge and intent of a defendant charged with a crime in which intent to distribute drugs is an element").

These convictions were similar in kind to the charged offense and not overly remote in time. Indeed, the drug at issue in the prior convictions—methamphetamine—was also at issue in this case. Moreover, while the prior convictions occurred roughly seventeen years before the charged conspiracy began, "there is no fixed period within which the prior acts must have occurred." United States v. Baker, 82 F.3d 273, 276 (8th Cir. 1996). Rather, we apply a standard of reasonableness, United States v. Green, 151 F.3d 1111, 1113 (8th Cir. 1998), and have found that evidence of older convictions was properly admitted. See, e.g., United States v. Walker, 470 F.3d 1271, 1275 (8th Cir. 2006) (eighteen years separated prior offense and charged offense); United States v. Williams, 308 F.3d 833, 836-37 (8th Cir. 2002) (twenty years separated prior offense and charged offense). Under the circumstances of this case, and while acknowledging that these 1998 convictions are at the outer limits of relevancy, the district court did not abuse its discretion in determining that Shelledy's prior convictions were not too remote in time.

Finally, the district court issued a limiting instruction reminding the jury of the permissible purposes of this evidence. See United States v. Ironi, 525 F.3d 683, 688 (8th Cir. 2008) (noting that the "prejudicial effect of admitting the prior crimes was reduced by the district court's limiting instruction to the jury that it could only consider the prior crimes to determine [the defendant's] intent"). Thus, we are

satisfied that the prejudicial effect of this evidence did not "substantially outweigh" its probative value.

Accordingly, we find that the district court did not abuse its discretion in admitting this evidence. And even if it did, any error would have been harmless in light of the rest of the evidence presented at trial. See United States v. Cotton, 823 F.3d 430, 435 (8th Cir. 2016) (harmless-error standard). There was ample evidence supporting Shelledy's conviction, including testimony from Redies, Wolfe, and Smith; evidence from Shelledy's social media activity; and physical evidence recovered from Shelledy's home.

C.

Lastly, Shelledy argues that the district court abused its discretion in imposing limitations on the scope of impeachment based on the prior convictions of government witnesses. Specifically, he claims that it erred in refusing to allow him to inquire about: (1) Wolfe's convictions that were more than ten years old, (2) the factual circumstances and details of other witnesses' prior convictions, beyond the general nature, place and date of the offense, and sentence imposed, and (3) other alleged criminal actions by government witnesses not resulting in convictions.

Under Rule 609(a), evidence of a witness's prior criminal convictions may be introduced for impeachment purposes if: (1) the offense of conviction was a felony, the witness against whom it is introduced is not the defendant in a criminal case, and it satisfies Rule 403[2]; or (2) the offense involved a dishonest act or false statement. However, the use of convictions that are older than ten years is limited by Rule

---

[2]Rule 403 provides that a district court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

609(b), which requires that the probative value of a conviction older than ten years substantially outweigh its prejudicial effect, and that the proponent of the conviction give written notice of his intent to use that conviction. "Rule 609(b) effectively establishes a rebuttable presumption against the admissibility of prior convictions more than ten years old." United States v. Stoltz, 683 F.3d 934, 939-40 (8th Cir. 2012) (internal quotation marks omitted). Such "convictions should be admitted very rarely and only in exceptional circumstances." Id. at 940 (internal quotation marks omitted).

Here, Shelledy was permitted to inquire about a 2008 conviction and the fact that Wolfe pled guilty to fifteen counts related to this case. We find unpersuasive his argument that the district court erred by not allowing him to cross examine Wolfe about prior convictions that were more than ten years old. He fails to explain what "exceptional circumstances" would warrant the necessity of such evidence in this case. See id.

We are also unconvinced by Shelledy's argument that the district court erred by refusing to permit cross examination of other government witnesses on their prior convictions beyond the names, dates, places, and sentences imposed for those offenses. We have previously observed that "[t]he ability to introduce the specific crime is not a license to flaunt its details, however; cross-examiners are limited to eliciting the name, date and disposition of the felony committed." Cummings v. Malone, 995 F.2d 817, 826 (8th Cir. 1993). Shelledy was able to impeach several witnesses by eliciting testimony concerning the nature, place and date of the offense, and sentence imposed—under the circumstances of this case, the district court acted within its discretion to limit any further discussion of those convictions. See id.

Moreover, Shelledy points to other alleged criminal actions by government witnesses, which did not result in convictions, and which he was unable to use on cross examination. A district court may, under Rule 608(b), allow impeachment of

a witness regarding specific instances of bad conduct not resulting in a conviction if such conduct is probative of the witness's character for truthfulness. However, Shelledy does not make any specific arguments in his brief for why such conduct would have been probative of the witnesses' character for truthfulness. See Chay-Velasquez v. Ashcroft, 367 F.3d 751, 756 (8th Cir. 2004) ("Since there was no meaningful argument on this claim in his opening brief, it is waived.").

IV.

Finally, Shelledy asserts that the district court erred in instructing the jury that it could interpret his attempt to influence a witness as consciousness of his guilt. "We review the district court's jury instructions for abuse of discretion and will affirm [i]f the instructions, taken as a whole, fairly and adequately submitted the issues to the jury." United States v. Florez, 368 F.3d 1042, 1044 (8th Cir. 2004) (alteration in original) (internal quotation marks omitted). In determining whether sufficient evidence supported the district court's decision to give an instruction, we review the evidence in the light most favorable to the party requesting the instruction and draw all reasonable inferences in that party's favor. United States v. Reaves, 649 F.3d 862, 867-68 (8th Cir. 2011).

Specifically, the district court instructed the jury that "attempts by the defendant to influence witnesses in connection with the crime charged . . . may be considered . . . [as] show[ing] a consciousness of guilt." See 8th Cir. Model Jury Instructions § 4.09 (2017). Shelledy does not challenge the instruction as a misstatement of the law. Instead, he asserts that there was insufficient evidence to support giving the instruction.

However, the instruction was supported by the testimony of Robert Summers, who was a government witness in this case. Summers testified that Shelledy had approached him and asked him to falsely testify that Bradley had admitted to lying

-13-

about the case to Summers. When this testimony is viewed in the light most favorable to the government, the district court did not abuse its discretion in giving the instruction. See United States v. Grajales-Montoya, 117 F.3d 356, 361 (8th Cir. 1997) (noting that the evidence was sufficient to give similar instruction where a defendant simply urged a potential government witness "not to give federal agents any papers or information").[3]

V.

For the foregoing reasons, we affirm the judgment of the district court.

_____

---

[3]Because we find that Summers's testimony was a sufficient basis from which to give the consciousness-of-guilt instruction, we need not consider the remainder of the parties' arguments on this issue. See Lane v. Peterson, 899 F.2d 737, 742 (8th Cir. 1990) ("We may affirm a judgment on any ground supported by the record even if not relied upon by the district court.").