# United States Court of Appeals
### For the Eighth Circuit

_____

No. 19-1017
_____

United States of America

*Plaintiff - Appellee*

v.

Jovan Marquis Harris

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of North Dakota - Fargo

_____

Submitted: May 12, 2020
Filed: July 20, 2020

_____

Before SMITH, Chief Judge, MELLOY and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Jovan Marquis Harris was indicted on seven drug-related charges stemming from his participation in a heroin-distribution conspiracy in the Fargo, North Dakota area. Following a six-day jury trial, Harris was convicted of six of the seven charged

offenses. The district court[1] sentenced Harris to 300 months imprisonment on Counts 1, 2, 3, and 5, and to 240 months imprisonment on Counts 6 and 7, with all sentences running concurrently. On appeal, Harris challenges the sufficiency of the evidence on the six counts of conviction. Having jurisdiction under 28 U.S.C. § 1291, we affirm the district court. We deny Harris's motion to correct the record and his pro se motion to file a supplemental brief.

## I.

"We recount the relevant testimony and other evidence presented at trial in the light most favorable to the jury's verdict." United States v. Shavers, 955 F.3d 685, 688 n.2 (8th Cir. 2020).

## A.

In Spring 2015, Morgan Masters met Harris, also known as "Pooh," through her friend Brazil Middell. Masters soon learned that Harris could sell her heroin, and she started purchasing Harris's heroin through Brazil and his brother, Willie. Brazil and Willie told Masters that the heroin she was purchasing came from Harris. Masters testified that, beginning in early Summer 2015 and continuing until their overdoses later that summer, she and her boyfriend, Tyler McIntosh, purchased their heroin directly from Harris. They arranged purchases from Harris almost daily via phone calls and text messages. The two would frequently purchase a "point," which is one-tenth of a gram, or two points at a time from Harris, and they would meet Harris at a Motel 6 and other places in the Fargo area. The purchase price was $60, and they would keep some heroin for themselves and resell some of it.

---

[1]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa, now retired, sitting by designation in the District of North Dakota.

Around this time, Jacob Wetch was also selling heroin in Fargo. Wetch met Harris through Brazil, and he started to regularly source his heroin from Harris for resale to others. Wetch and Harris would complete between two to ten deals per day during this time when Harris was in town, and they would arrange meetings at various places, including a Motel 6, Super 8 motel, Simonson's gas station, and Wal-Mart. Derek Pettersson, who purchased heroin from Wetch over the course of a month during Summer 2015, and usually in half-gram quantities for $150, learned that Harris was Wetch's source because Wetch picked up heroin at Harris's duplex near Pettersson's house. Wetch's and Pettersson's relationship ended when Pettersson robbed Wetch and Harris. Wetch, however, denied selling to Pettersson, except for the one deal in which Pettersson robbed Wetch and Harris.

In June or July 2015, Alexis Centers also started purchasing heroin from Harris, using Jordan Larry as a middleman. At trial, Centers identified Larry's source as a black male with dreads who drove a silver Chrysler 300 with tinted windows. Almost daily, Centers contacted Larry and gave him money for heroin—about a half gram for $150 at a time. Larry would meet his source at various locations, including a Hornbacher's grocery store and a Motel 6, and return to Centers with the heroin.

At trial, many of these individuals—including Masters, McIntosh, and Wetch—identified Harris as the person they knew as "Pooh" or who sold them heroin.

B.

On the morning of September 1, 2015, Larry died from a heroin overdose. After a series of anonymous phone calls, police began to investigate Harris as the source of the heroin that killed Larry. The night before Larry's death, Centers met Larry and an unknown individual, later identified as Zach Spieker, at a Dairy Queen. Centers purchased a half gram of heroin from Larry, but the transaction was unusual because

Larry had the heroin on him and did not leave to procure it from his source. After the transaction was completed, Centers saw Larry leave with Spieker in a blue vehicle.

Law enforcement learned from Spieker that Spieker and Larry had met Larry's heroin source about an hour earlier at Stamart Liquors. Surveillance video from Stamart shows a silver Chrysler 300 with out-of-state plates drive into the parking lot, followed shortly thereafter by a blue Ford Taurus. The footage shows both cars leaving shortly afterwards. Call and text logs from Larry's phone documented numerous contacts between Larry and Harris before the meeting at the Stamart parking lot.

This information was corroborated by other evidence. Text messages between Centers and Larry and video surveillance at the Dairy Queen demonstrated that Centers and Larry arranged a meeting on August 31, 2015 and that they met at the Dairy Queen around 6:30 p.m. that day. Text messages between Centers and Larry also suggest that Larry was with his source in the time leading up to the meeting. Centers testified at trial that she observed Larry's source drive a silver Chrysler 300 with tinted windows, and Wetch testified that Harris drove a Chrysler with out-of-state license plates. Law enforcement had also previously observed Harris drive a silver Chrysler 300 with Wisconsin license plates, and the video surveillance footage from Stamart showed that the Chrysler 300 had out-of-state plates resembling Wisconsin license plates.

Masters and McIntosh also overdosed on heroin on August 27, 2015 and September 1, 2015, respectively. They each collapsed almost immediately after injecting the heroin, though both survived their overdoses. They testified that the heroin that resulted in their overdoses was obtained from Harris.

Around the time of the overdoses, Harris left town and directed Masters and McIntosh to get heroin from Harris's associate, "P" (also known as Pete), later

identified as James Smith. Masters and McIntosh then began to deal with Smith, though they saw Harris on occasion. Harris also connected Wetch with Smith in order to obtain heroin in Harris's absence. Smith acknowledged that he distributed heroin for Harris in 2015, but only after Larry had died. Smith would call Harris to get more heroin, and various women would deliver it and take Smith's money back to Harris.

## C.

On March 21, 2016, law enforcement set up a controlled buy of heroin from Harris, using an individual named Paul Ramirez. Ramirez had previously been arrested for possession of methamphetamine and had been staying with Masters and McIntosh. McIntosh told Ramirez that he needed to leave because Harris planned to stay there and also that Harris had heroin for sale. Harris later gave Ramirez a sample of his heroin. Ramirez informed law enforcement that Harris was a heroin dealer and staying with McIntosh. Law enforcement entered into a confidential informant agreement with Ramirez, and Ramirez went to McIntosh's apartment to buy heroin from Harris. Ramirez did not recall who he gave his money to, but he testified that he knew he gave it in exchange for heroin. Harris then entered the bathroom in the apartment and left, at which point Ramirez entered the bathroom and found a half gram of heroin. Ramirez took the heroin, left the apartment, and surrendered it to the officers. Ramirez identified Harris as the person from whom he had purchased heroin, and law enforcement obtained a search warrant for McIntosh's apartment.

On March 22, 2016, Ramirez participated in a second controlled buy, which was similar to the first controlled buy, except that Ramirez left his money by the PlayStation game console which Harris was using. Like the first controlled buy, Harris went into the bathroom to prepare and leave the heroin, and Ramirez later went into the bathroom to retrieve it. After Ramirez left the apartment, law enforcement officers executed the search warrant. The officers found heroin, $501 on Harris's person, and $1,389 in a laundry basket next to a Wisconsin instructional permit with

Harris's photo and name. Additionally, $460 of those bills had serial numbers matching those of the bills given by law enforcement to Ramirez to perform the controlled buy. Harris told the officers he got the cash by selling a car, but he could not say to whom he sold it or where the sale took place.

D.

Following an investigation, Harris was indicted for the following: conspiracy to possess with intent to distribute and distribute a controlled substance resulting in serious bodily injury or death (Count 1), distribution of a controlled substance resulting in death (Count 2), distribution of a controlled substance resulting in serious bodily injury (Counts 3, 4, and 5), and distribution of a controlled substance (Counts 6 and 7), all in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846; and 18 U.S.C. § 2. The jury found Harris guilty of all charges except for Count 4.

II.

On appeal, Harris challenges only the sufficiency of the evidence on each of the six counts of conviction. Specifically, he contends that the government's evidence at trial failed to show: (1) anything more than a buyer-seller relationship between Harris and any other individual, (2) that it was Harris's heroin that caused Larry's death by overdose or resulted in Masters's or McIntosh's serious bodily injury by overdose, and (3) that Harris distributed heroin to Ramirez during the controlled buys. "[W]e will review the sufficiency of the evidence to sustain a conviction de novo, viewing the evidence in the light most favorable to the jury's verdict and reversing the verdict only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Ramos, 852 F.3d 747, 753 (8th Cir. 2017) (internal quotation marks omitted).

## A.

First, we consider whether there was sufficient evidence to sustain Harris's conviction on Count 1, conspiracy to possess with intent to distribute and distribute a controlled substance resulting in serious bodily injury or death. "To establish the existence of a conspiracy, the government must prove that: 1) there was a conspiracy to distribute a controlled substance; 2) the defendant knew of the conspiracy; and 3) the defendant knowingly participated in the conspiracy." United States v. Bordeaux, 436 F.3d 900, 903 (8th Cir. 2006). We have also explained that:

> Because conspiracies are often secretive, their existence may be proven through circumstantial evidence alone, and evidence of an agreement to join the conspiracy may be inferred from the facts. Additionally, a defendant may be convicted for even a minor role in a conspiracy, so long as the government proves beyond a reasonable doubt that he or she was a member of the conspiracy.

United States v. Shelledy, 961 F.3d 1014, 1019 (8th Cir. 2020) (internal quotation marks, citation, and alteration omitted).

Here, there was ample evidence showing that Harris participated in a heroin-distribution conspiracy and that his involvement went well beyond that of a mere buyer-seller relationship with his unindicted co-conspirators. Multiple witnesses testified about how they repeatedly purchased heroin from Harris, both for resale and personal use. For example, Wetch started sourcing his heroin from Harris and would obtain distribution quantities of heroin from him, including up to a couple of "eight-balls," which is 3.5 grams, at a time. See United States v. Schubel, 912 F.2d 952, 956 (8th Cir. 1990) ("Intent to distribute may be inferred solely from the possession of large quantities of narcotics."). When Harris was in town, Wetch estimated doing between two to ten deals per day with Harris. Wetch also testified that he, in turn, sold to up to 50 people in 2015 and 2016. Moreover, Masters and McIntosh bought

heroin from Harris either daily or every other day during Summer 2015, and they testified that they sold some of that heroin to others. Additionally, various government witnesses, including Masters, testified that Harris made arrangements to continue to sell heroin to them, even after Harris left town, through Smith. Smith testified that, after Larry's death, Harris sent him heroin in a package, and Smith would break it down and further distribute it. Smith sold it to Wetch and also knew that McIntosh received some of it. And for the reasons discussed further in Section II.B, sufficient evidence linked Harris to the heroin on which Larry, Masters, and McIntosh overdosed, resulting in Larry's death and substantial bodily injury to Masters and McIntosh.

The evidence at trial supported a finding that Harris had more than a mere buyer-seller relationship with the other individuals involved in his sales of heroin.[2] "Because the crime of conspiracy requires a concert of action among two or more persons for a common purpose, the mere agreement of one person to buy what another agrees to sell, standing alone, does not support a conspiracy conviction." United States v. Prieskorn, 658 F.2d 631, 634 (8th Cir. 1981) (quoting United States v. Mancillas, 580 F.2d 1301, 1307 (7th Cir. 1978)). "But we have emphasized that such buyer-seller cases involve only evidence of a single transient sales agreement and small amounts of drugs consistent with personal use." Shelledy, 961 F.3d at 1019 (internal quotation marks and alteration omitted). "Where the evidence shows multiple transactions involving large amounts of drugs, we have held this is sufficient

_____

[2]The government argues that Harris waived the buyer-seller argument because he did not request a buyer-seller instruction below or advance it as a theory of defense. Accordingly, the government contends that our review is only for plain error. However, while this failure would waive a claim of instructional error, it does not waive Harris's claim that the evidence only showed "a buyer-seller relationship [that] without more is not sufficient to prove a conspiracy." United States v. Finch, 16 F.3d 228, 231 (8th Cir. 1994).

to support a conclusion that the drugs were purchased for resale." United States v. Donnell, 596 F.3d 913, 925 (8th Cir. 2010).

As discussed above, the government presented evidence showing that Wetch, Masters, McIntosh, and Larry repeatedly purchased heroin from Harris for resale and personal use. Harris also made arrangements for several of these individuals to continue purchasing drugs through Smith, whom Harris supplied, while Harris was out of town. Because the facts showed (1) ongoing heroin sales, (2) over the course of many months, (3) with significant, and even daily, frequency, and (4) involving multiple individuals, this is simply not a case involving a "single transient sales agreement and small amounts of drugs consistent with personal use." Shelledy, 961 F.3d at 1019 (quoting Prieskorn, 658 F.2d at 634). Accordingly, we conclude that the jury could reasonably find beyond a reasonable doubt that Harris did not have a mere buyer-seller relationship with the other individuals involved in this case.

B.

Second, we consider Harris's argument that there was insufficient evidence to sustain his convictions on Counts 2, 3, and 5—distribution of a controlled substance resulting in death or serious bodily injury. "To sustain a conviction under 21 U.S.C. § 841(a)(1) with a serious bodily injury or death enhancement under § 841(b)(1)(C), the government must prove: (i) knowing or intentional distribution of heroin, and (ii) serious bodily injury or death caused by ('resulting from') the use of that drug." United States v. Lewis, 895 F.3d 1004, 1009 (8th Cir. 2018), cert. denied, 139 S. Ct. 850 (2019) (internal quotation marks and alterations omitted).

i.

Count 2 charged distribution of a controlled substance resulting in Larry's death. On appeal, Harris argues that there was insufficient evidence presented at trial showing that Larry obtained the heroin that resulted in his death from Harris or a conspiracy of which Harris was a part. In support of this argument, Harris relies on Burrage v. United States, 571 U.S. 204, 218-19 (2014), in which the Supreme Court held that if "use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." Harris argues that because it was highly likely that someone else's heroin caused the overdose,[3] Harris's alleged distribution of the drug to Larry could not be the but-for cause of Larry's death.

Whether Harris's or someone else's heroin caused Larry's overdose "created a factual issue for the jury to resolve rather than an absolute legal bar to conviction." United States v. Seals, 915 F.3d 1203, 1206 (8th Cir.) (rejecting the notion that the government must disprove another potential cause of an overdose in order to prove the overdose was caused by heroin), cert. denied, 140 S. Ct. 259 (2019); cf. United States v. Ford, 750 F.3d 952, 955 (8th Cir. 2014) (holding that because death was caused by ingestion of multiple narcotics, government only proved that heroin was a contributing factor to, rather than the but-for cause of, the fatal overdose). Here, there is no dispute that heroin caused Larry to overdose, and there is sufficient circumstantial evidence from which a jury could conclude, beyond a reasonable doubt, that Harris's heroin was the but-for cause of Larry's overdose. Indeed, before his

---

[3]The government argues that Harris conceded that the overdoses were the but-for causes of Larry's death and Masters's and McIntosh's serious bodily injuries, and that we should review the issue for plain error. This argument, however, misses the mark—while Harris concedes that all three overdosed on heroin, he asserts that he did not distribute or provide the heroin that led to the death and injuries at issue.

-10-

overdose, Larry sent a text message to Centers stating that he was with his source before meeting up with Centers at the Dairy Queen to sell her heroin. And prior to Centers's and Larry's meeting, video surveillance showed a car associated with Larry park in Stamart parking lot close to a silver Chrysler 300, which multiple pieces of evidence linked to Harris. Moreover, multiple witnesses, including Masters, McIntosh, and Wetch, identified Harris as Larry's source of heroin. Therefore, we find that sufficient evidence supports Harris's conviction on Count 2.

ii.

Counts 3 and 5 charged distribution of a controlled substance resulting in the serious bodily injury of McIntosh and Masters. Harris argues that Masters and McIntosh were inconsistent in their testimony regarding whether Harris provided the heroin that caused their overdoses. However, Masters testified that she was "pretty sure" she overdosed on heroin that she had bought from Harris. While McIntosh initially testified that he did not know who he had bought the heroin from, he also testified that he was only buying from Harris at the time of his overdose, and Masters confirmed that McIntosh's heroin came from Harris because she had picked it up for him. This is sufficient evidence from which a jury could determine beyond a reasonable doubt that the heroin which caused both overdoses was from Harris. Further, to the extent Harris is challenging their credibility as witnesses, "credibility determinations are left to the jury." United States v. Wallace, 713 F.3d 422, 428 (8th Cir. 2013). Thus, we conclude that sufficient evidence supports Harris's convictions on Counts 3 and 5.

C.

Finally, we consider Harris's argument that there was insufficient evidence to sustain his convictions on Counts 6 and 7—distribution of heroin arising out of the controlled buys set up by law enforcement in March 2016. "To prove that [Harris]

-11-

distributed [heroin] in violation of 21 U.S.C. § 841(a)(1), the government is required to prove that [Harris] distributed the [heroin], and that he knew it was a controlled substance at the time of distribution." Ramos, 852 F.3d at 753.

Harris argues that during the controlled buys, the evidence showed that Ramirez dealt entirely with McIntosh, not Harris. Put differently, he asserts that the evidence showed that it was McIntosh, not Harris, from whom Ramirez purchased the heroin. Contrary to Harris's argument, there was sufficient evidence from which the jury could find that Harris distributed the heroin to Ramirez. Ramirez and McIntosh testified that Ramirez purchased the heroin from Harris during both of the controlled buys. While Ramirez made arrangements for the deals through McIntosh, Harris went into the bathroom, prepared the heroin, and after Harris left the bathroom, Ramirez knew to go inside to pick it up. Moreover, during the second controlled buy, Ramirez placed his buy money next to the PlayStation that Harris was playing, and Harris went to the bathroom, performing the same actions as in the first controlled buy. Further, when law enforcement officers executed their search warrant, they found $501 on Harris's person and $1,389—$460 of which matched the serial numbers from the buy fund money—in a laundry basket next to a Wisconsin instructional permit with Harris's photo and name. Although Harris told the officers he got the cash by selling a car, he could not say to whom or where he sold it. From this evidence, a jury could reasonably conclude that Ramirez was ultimately purchasing the drugs from Harris, despite McIntosh's involvement. Accordingly, we find that there was sufficient evidence to support Harris's convictions on Counts 6 and 7.

### III.

Lastly, we deny Harris's motion to correct the record and his pro se motion to file a supplemental brief. First, as to his motion to correct the record, we note that the certified transcript is "deemed prima facie a correct statement of the testimony taken and proceedings had." 28 U.S.C. § 753(b). Aside from his unsworn assertion that his

recollection of the proceedings is different, Harris has not put forth any evidence that would overcome this statutory presumption. See Davis v. United States, Nos. 1:08-CV-531-T, 1:05-CR-206-T, 2009 WL 1628882, at *7 (W.D.N.C. June 10, 2009) (noting that a "'sound recollection' of the testimony is insufficient to overcome the statutory presumption that the transcript is correct"). Accordingly, we see no reason to remand this issue for resolution by the district court as required by Fed. R. App. P. 10(e). Second, we deny Harris's pro se motion to file a supplemental brief because, even if we were to grant his motion, his proposed supplemental brief does not change our analysis.

IV.

For these reasons, we affirm the judgment of the district court and deny Harris's motion to correct the record and his pro se motion to file a supplemental brief.

_____