# United States Court of Appeals
## For the Eighth Circuit
_____

No. 19-1127, 19-1491, 19-1523, 19-1897
_____

United States of America

*Plaintiff - Appellee*

v.

Alston Campbell, Jr., Alston Campbell, Sr., Willie Carter, and William Marcellus Campbell

*Defendants - Appellants*
_____

Appeal from United States District Court
for the Northern District of Iowa - Waterloo
_____

Submitted: September 24, 2020
Filed: January 21, 2021
_____

Before LOKEN, SHEPHERD, and ERICKSON, Circuit Judges.
_____

SHEPHERD, Circuit Judge.


After a multi-year investigation featuring confidential informants, controlled buys, wiretaps, and surveillance, a grand jury indicted William Marcellus Campbell (William), Alston Campbell, Jr. (Junior), Willie Junior Carter (Carter), Alston Campbell, Sr. (Senior), "A.M.", "J.P.", and "D.S." on various drug trafficking charges. The government moved to sever J.P.'s and Carter's trials for a separate

joint trial to precede that of the remaining co-defendants, and the district court granted that motion.  The grand jury then returned a superseding indictment.  A.M., J.P., and D.S. entered guilty pleas, and a jury convicted the four remaining defendants (William, Junior, Carter, and Senior).  William, Junior, Carter, and Senior now appeal.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.[1]

I.

In 2016, a task force began investigating illegal drug trafficking activities within Eastern Iowa.  Specifically, the task force began investigating the Campbell family organization after confidential sources provided information that the organization was trafficking narcotics throughout the Waterloo, Iowa area.  The Assistant United States Attorney (AUSA) for the Northern District of Iowa submitted a wiretap application for the surveillance of target cell phones belonging to William.  The wiretap application was supported by an affidavit containing sworn testimony from an investigator with the City of Cedar Rapids Drug Enforcement Task Force, Officer Bryan Furman.  Officer Furman stated that the wiretap would intercept communications between William, Junior, Senior, A.M., J.P., and "others yet unknown." R. Doc. 127-1, at 18.  Officer Furman identified William as a "retail level" crack cocaine distributor within a distribution operation led by Junior.  R. Doc. 127-1, at 26.  Officer Furman testified that intercepted communications from the target cell phones would likely identify the leadership of the distribution network and the location(s) of narcotics and provide evidence concerning the target offenses; drug supply; transporters; financiers; manufacturers; distributors; and customers.  In his affidavit, Officer Furman further testified that because the affidavit served the "limited purpose of securing authorization for the interception of wire and electronic communications," he included only those facts that he believed were "necessary to establish the foundation for an order authorizing" that interception.  R. Doc. 127-1, at 21-22.  Officer Furman also testified that "[n]ormal investigative procedures have

---

[1]The Honorable Linda R. Reade, United States District Court for the Northern District of Iowa, adopting in part the reports and recommendations of the Honorable C.J. Williams, United States Magistrate Judge for the Northern District of Iowa.

been tried and have failed, appear unlikely to succeed if tried, or are too dangerous to employ." R. Doc. 127-1, at 19.

In the wiretap application, Officer Furman testified that investigators had previously engaged two members of the organization as cooperators, and those cooperators participated in controlled narcotics purchases. However, these cooperators continued participating in uncontrolled criminal activity, and investigators quit engaging with them to protect the investigation's secrecy. In addition to relying on cooperators, investigators had employed surveillance, cell site location tracing, pen registers, trash searches, and search warrants. Although these investigative techniques provided some helpful information—revealing the identity of retail-level distributors and the patterns of individuals' movements and resulting in the seizure of small amounts of narcotics—investigators were still unable to uncover information such as supply sources, organizational hierarchy, and major inventory locations. In the application, Officer Furman also discussed investigative techniques that the task force had not employed but that would likely prove unfruitful or too dangerous: financial investigations using subpoenas and search warrants; undercover agents; field interviews; or grand-jury subpoenas of persons associated with the organization. The district court issued a wiretap order authorizing surveillance of the cell phones on October 24, 2016.

On July 10, 2017, a grand jury indicted William, Junior, Carter, Senior, A.M., J.P., and D.S. on various drug-trafficking charges. William and Junior each filed a motion to suppress the government's wiretap evidence. In their motions, William and Junior both argued that the government, in its Title III application, did not provide the magistrate judge with a "full and complete" statement of facts. R. Doc. 117, at 2; R. Doc. 115, at 2. Instead, they argued, Officer Furman provided only those facts that he found pertinent to the district court's evaluation of necessity rather than allowing the court to make an independent finding of necessity from all available facts. Junior separately argued that the government failed to properly minimize intercepted communications.

-3-

On January 22, 2018, the magistrate judge issued a report and recommendation, recommending that the district court deny Junior's and William's motions to suppress as to the issue of necessity. Junior then filed a supplemental brief addressing alleged minimization violations, which the government opposed. On January 30, 2018, the magistrate judge issued a second report and recommendation, recommending that the district court deny Junior's motion asserting minimization violations. The district court adopted the magistrate judge's report and recommendations in part.[2]

On February 22, 2018, a grand jury issued a superseding indictment. This indictment included fourteen total counts, but only six of those counts charged Appellants. In Count 1, the grand jury charged all defendants with conspiracy to distribute cocaine and cocaine base. In Counts 3 and 4, the grand jury charged Senior (Count 3) and William (Count 4) each with distribution of cocaine base. In Count 12, it charged William with distribution of cocaine. In Count 13, the grand jury charged Carter with possession with intent to distribute cocaine base. Finally, in Count 14, the grand jury charged Junior with possession with intent to distribute cocaine. Ultimately, a jury convicted: Junior of Counts 1 and 14; Senior of Counts 1 and 3; William of Counts 1, 4, and 12; and Carter of Counts 1 and 13.

II.

A. William's Appeal

A jury convicted William of conspiracy to distribute cocaine and cocaine base (Count 1), distribution of cocaine base (Count 4), and distribution of cocaine (Count

---

[2]In his first report and recommendation, the magistrate judge opined that, even if the application did not establish necessity, the Leon good-faith exception, United States v. Leon, 468 U.S. 897 (1984), would save the fruits of the Title III order from suppression. However, because the district court was "satisfied" that the necessity requirement had been met, the court did not decide whether Leon would apply and therefore did not adopt that portion of the magistrate judge's report and recommendation.

12). On appeal, William alleges that the district court erred by: (1) denying his motion to suppress the wiretap evidence; (2) limiting cross-examination; (3) denying his request for a multiple conspiracies jury instruction; and (4) applying witness intimidation and aggravated role enhancements.

1.

William first argues that the district court erred by denying his motion to suppress the wiretap evidence. "We review the denial of a motion to suppress de novo but review underlying factual determinations for clear error, giving due weight to the inferences of the district court and law enforcement officials." United States v. Milliner, 765 F.3d 836, 839 (8th Cir. 2014) (quoting United States v. Thompson, 690 F.3d 977, 984 (8th Cir. 2012)).

"Title III of the Omnibus Crime Control and Safe Streets Act of 1968 [(codified as amended at 18 U.S.C. §§ 2510-23) (Title III)] prescribes the procedure for securing judicial authority to intercept wire communications in the investigation of specified serious offenses." United States v. Giordano, 416 U.S. 505, 507 (1974). Each wiretap application must include a "full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued . . . ." 18 U.S.C. § 2518(1)(b). Similarly, applicants must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Id. § 2518(1)(c). Before authorizing a wiretap, a judge must determine, based on the facts submitted by the applicant, that a wiretap is necessary. Id. § 2518(3). Suppression of wiretap evidence is appropriate where any one of Title III's statutory requirements is unsatisfied. Giordano, 416 U.S. at 527.

Here, William argues that the government failed to establish necessity. He maintains that investigators chose to target his phones—rather than those of other retail-level dealers in the organization—because of his familial relationship with

Senior and Junior, and by not disclosing this motivation to the district court, Officer Furman did not provide the district court with a "full and complete statement of the facts and circumstances." 18 U.S.C. § 2518(1)(c). Further, William asserts that by omitting this information, Officer Furman evaluated necessity using the facts that *he* found pertinent (rather than providing the district court with all available facts), improperly stripping the court of its fact-finding function. We disagree.

A district court's finding of necessity is a finding of fact, which we review for clear error. United States v. Jackson, 345 F.3d 638, 644 (8th Cir. 2003). As a reviewing court, we must "accord broad discretion" to the district court's authorization of a wiretap. United States v. Garcia, 785 F.2d 214, 221-22 (8th Cir. 1986). Wiretaps should be authorized only when necessary, but in drafting an affidavit in support of a wiretap application, investigators "need not explain away all possible alternative techniques." Id. at 223. "If law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied." United States v. Turner, 781 F.3d 374, 382 (8th Cir. 2015) (citation omitted).

Here, Officer Furman's affidavit was exhaustive. He detailed each technique that investigators had tried and explained why those techniques had failed to achieve the investigation's goals. Similarly, he discussed outstanding investigative methods and explained why those methods either would be unhelpful or inordinately dangerous. Officer Furman's failure to expressly state that the application was motivated, in part, by William's familial relationship with Senior and Junior does not invalidate the district court's finding of necessity. Further, any potential advantage to be garnered from William's familial relationships was apparent from the extensive facts Officer Furman offered. Finally, Officer Furman dedicated much of his affidavit to explaining why "conventional investigatory techniques" had not been successful, and why other, unattempted techniques would not be successful, in exposing the full extent of the conspiracy. Id. We find that the district court did not

clearly err in finding that the wiretaps were necessary and ultimately did not err in denying William's motion to suppress the wiretap evidence.[3]

2.

William next claims that the district court erred by limiting his cross-examination of the government's cooperating witnesses at trial. When reviewing a district court's limitations on cross-examination, we apply an abuse of discretion standard; we will reverse only if a clear abuse of discretion occurred and if that error prejudiced the defendant. United States v. Wright, 866 F.3d 899, 905 (8th Cir. 2017). "If the record establishes a violation of the rights secured by the Confrontation Clause of the Sixth Amendment, we must determine whether the error was harmless in the context of the trial as a whole." Id. (citation omitted).

The Sixth Amendment's Confrontation Clause affords criminal defendants the right to be "confronted with the witnesses against him." U.S. Const. amend. VI. At the heart of the Clause is a defendant's opportunity to cross-examine. Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986); see also United States v. Wright, 866 F.3d 899, 906 (8th Cir. 2017) ("The primary purpose of this right is to guarantee the opportunity for effective cross-examination, particularly with respect to a witness's potential bias." (citation omitted)). Yet, this right is not without limit. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679. "A limitation on cross-examination does not violate the Sixth Amendment unless the defendant shows that a reasonable jury might have received a significantly different impression of the witness's credibility had defense counsel

---

[3]Because we find that the necessity requirement was met, we need not reach the government's argument that the Leon good faith exception applies.

been permitted to pursue his proposed line of cross-examination." United States v. Dunn, 723 F.3d 919, 934 (8th Cir. 2013) (citation omitted).

Here, the district court allowed defense counsel to cross-examine the government's cooperating witnesses about looming mandatory minimum or "substantial" sentences they faced, the possibility of receiving an increased sentence based on prior criminal history, and their hopes of earning a reduced sentence through their cooperation. However, the court did not allow cross-examination that would reveal the precise amount of incarceration, in years, that any witness was facing.

Although this Court has recognized the sanctity of a defendant's ability to expose witness bias, see, e.g., United States v. Walley, 567 F.3d 354, 358 (8th Cir. 2009), here William has not shown that the district court abused its discretion. Our analysis in Walley is instructive. Id. at 358-60. There, we found no error where the district court prevented defense counsel from asking about the witness's potential five-year minimum sentence but instead allowed questioning about the witness's potential "significant sentence." Id. Important to our analysis was the fact that while the cooperating witness *hoped* for a reduction in his sentence, the government had not yet granted him leniency in exchange for his cooperation. Id. Because this leniency had not yet been granted, the degree of leniency—and, more significantly, the consideration granted to the witness for his cooperation—was unascertainable at the time of cross-examination.

William cites cases like United States v. Caldwell, 88 F.3d 522 (8th Cir. 1996)—and Junior, as discussed below, cites United States v. Roan Eagle, 867 F.2d 436 (8th Cir. 1989)—in which we found that a district court's limitation on cross-examination *was* an abuse of discretion. However, in Caldwell and Roan Eagle, we found that the district court had erred by forbidding cross-examination concerning potential minimum and maximum sentences because the government had *already* extended leniency to the cooperating witnesses. "Our decisions in Roan Eagle and Caldwell, therefore, emphasized that the accused should have been able to contrast

-8-

the original punishment faced by the witness with the more lenient punishment contemplated by the plea agreement—not merely that the original punishment alone was evidence of bias." Walley, 567 F.3d at 360. Roan Eagle and Caldwell are distinguishable from cases like Walley—and from William's case. Stated simply, where a cooperating witness simply hopes that his cooperation will manifest into some undefined degree of leniency, a district court does not abuse its discretion by limiting cross-examination to generalized phraseology like "significant sentence." Walley, 567 F.3d at 358-60.

At trial, the government revealed that it had cooperating witnesses and that four of those witnesses had plea agreements. William has provided "no offer of proof that [the witnesses] expected that a particular benefit would flow from [their] cooperation." Id. at 360. Instead, the record shows only that the witnesses "hoped through [their] assistance to reduce by an undefined degree the sentence that [they] otherwise faced." Id. Therefore, because William's requested line of questioning would have shown only that the cooperating witnesses hoped to reduce their sentences by an undefined degree through their cooperation, the district court did not abuse its discretion in limiting cross-examination to, among other things, the potential "substantial sentences" they faced. Because we find no error, we do not reach the prejudice inquiry.

William also contends that the district court erred by prohibiting his introduction of the government witnesses' plea agreements. However, whether to admit a cooperator's written plea agreement into evidence is "an issue committed to the district court's discretion." United States v. Morris, 327 F.3d 760, 762 (8th Cir. 2003). Here, as in Morris, the jury was aware of the plea agreements' existence, that the witnesses faced "substantial sentences," and that those witnesses hoped to receive a reduction in those sentences through their cooperation. Therefore, the district court did not abuse its discretion in limiting William's cross-examination of the government's cooperating witnesses.

3.

Prior to trial, William, Junior, and Senior jointly requested that the district court give a multiple conspiracies jury instruction. The district court, finding that such instruction was not supported by the evidence, denied their request. Post-conviction, William moved for a new trial and argued that the evidence supported a multiple conspiracies instruction because it revealed a second, separate conspiracy between Junior and N.S.

"A defendant is entitled to an instruction explaining his defense theory if the request is timely, the proffered instruction is supported by the evidence, and the instruction correctly states the law." United States v. Faulkner, 636 F.3d 1009, 1020 (8th Cir. 2011) (citation omitted). "[A]lthough district courts exercise wide discretion in formulating jury instructions, when the refusal of a proffered instruction simultaneously denies a legal defense, the correct standard of review is de novo." United States v. Bruguier, 735 F.3d 754, 757 (8th Cir. 2013) (en banc) (alteration in original) (emphasis omitted) (quoting United States v. Young, 613 F.3d 735, 744 (8th Cir. 2010)).

William (and Junior and Senior) moved for a multiple conspiracies instruction that mirrored Eighth Circuit Model Criminal Jury Instruction 5.06B. The proffered instruction read:

> The indictment charges that the defendants were members of one single conspiracy to commit the crime of Conspiracy to Distribute Cocaine and Cocaine Base.
>
> The government must convince you beyond a reasonable doubt that each defendant was a member of the conspiracy to commit the crime of (insert name of crime), as charged in the indictment. If the government fails to prove this as to a defendant, then you must [find] that defendant not guilty of the conspiracy charge, even if you [find] that he was a member of some other conspiracy. Proof that a defendant was a member of some other conspiracy is not enough to convict.

-10-

But proof that a defendant was a member of some other conspiracy would not prevent you from returning a guilty verdict, if the government also proved that he was a member of the conspiracy to commit the crime of Conspiracy to Distribute Cocaine and Cocaine Base, as charged in the indictment.

[A single conspiracy may exist even if all the members did not know each other, or never met together, or did not know what roles all the other members played. And a single conspiracy may exist even if different members joined at different times, or the membership of the group changed. Similarly, just because there were different subgroups operating in different places, or many different criminal acts committed over a long period of time, does not necessarily mean that there was more than one conspiracy. These are factors you may consider in determining whether more than one conspiracy existed.]

R. Doc. 249, at 48-49 (bracketed paragraph in original). This proffered instruction was timely offered and correctly states the law. Therefore, the only issue we must decide is whether this instruction was supported by the evidence. We find that it was not.

"Whether a given case involves single or multiple conspiracies depends on 'whether there was "one overall agreement" to perform various functions to achieve the objectives of the conspiracy.'" United States v. Radtke, 415 F.3d 826, 838 (8th Cir. 2005) (quoting United States v. Massa, 740 F.2d 629, 636 (8th Cir. 1984)).

To determine whether multiple conspiracies exist when a single large conspiracy has been charged by the government, this Court considers the totality of the circumstances, "including the nature of the activities involved, the location where the alleged events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which the acts occurred."

United States v. McCarthy, 97 F.3d 1562, 1571 (8th Cir. 1996) (citation omitted). "A single conspiracy may be found when the defendants share a common overall

goal and the same method is used to achieve that goal, even if the actors are not always the same." United States v. Gilbert, 721 F.3d 1000, 1005 (8th Cir. 2013) (quoting United States v. Bascope-Zurita, 68 F.3d 1057, 1061 (8th Cir. 1995)). Additionally, "[t]he fact 'that a number of separate transactions may have been involved . . . does not establish the existence of a number of separate conspiracies.'" United States v. Spector, 793 F.2d 932, 935 (8th Cir. 1986) (second alteration in original) (quoting United States v. Brewer, 630 F.2d 795, 799 (10th Cir. 1980)).

At trial, an agent involved in the investigation testified for the government. That agent explained that he wiretapped N.S.'s phone and discovered that Junior was N.S.'s supplier. N.S. also testified for the government. During his testimony, N.S. explained that he would buy cocaine from William when he was unable to reach Junior. Although William alleges that this indicates the existence of a separate conspiracy between Junior and N.S., we disagree. Junior's distributions to N.S. occurred in the same location—Waterloo, Iowa—during the same time period as the distributions for which William is charged. In fact, N.S.'s testimony establishes that Junior and William were interchangeable: N.S. could get the same product from William as he could from Junior when Junior was unavailable. And although William's identity as Junior's brother is not dispositive to our analysis, his familial relationship to Junior—a co-defendant in this case—is something we may consider. McCarthy, 97 F.3d at 1571. Because the location and time of the transactions between N.S. and Junior—as well as the identity of the persons involved and the product being sold—support the government's theory of a single conspiracy, we find that the district court did not err in denying a multiple conspiracies instruction.

4.

Finally, William challenges the district court's application of witness intimidation and aggravated role enhancements to his United States Sentencing Guidelines offense level. He also challenges the substantive reasonableness of his sentence.

-12-

First, William argues that the evidence did not support an aggravating role enhancement because he was a low-level, occasional drug dealer. "We review de novo the district court's construction and application of the Sentencing Guidelines, and we review for clear error its factual findings regarding enhancements." United States v. Wintermute, 443 F.3d 993, 1004 (8th Cir. 2006). The Guidelines allow for a four-level sentence enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." USSG § 3B1.1(a).

> To distinguish an organizer or leader from a manager or supervisor, the court may consider: (1) the exercise of decision[-]making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.

United States v. Gaye, 902 F.3d 780, 790 (8th Cir. 2018).

William's Presentence Investigation Report (PSR) noted that officers intercepted a phone call in which William discussed not only who worked for him, but also how much he paid those that worked for him. William objected, stating, "[William] notes that he does not recall the intercepted phone calls being played during the jury trial and that his discussions regarding paying workers may have been in regards to the employees who were paid for their work at his [construction] business . . . ." R. Doc. 429, at 7. William again objected to this at his sentencing hearing, stating, "[W]e disagree with the witness intimidation, the two levels there, and with the four levels for aggravating role." R. Doc. 539, at 2. At this time, the court recognized William's objection, stating, "The defense objects to the witness intimidation and role in the offense. Both of those enhancements are the government's burden by a preponderance of the evidence." R. Doc. 539, at 2.

-13-

Where a defendant objects to facts included in his PSR, the court has an obligation to make a factual finding on the disputed issue. United States v. Camacho, 348 F.3d 696, 700 (8th Cir. 2003). "In making its finding, the district court is bound to do so on the basis of the evidence and not the presentence report because the presentence report is not evidence and not a legally sufficient basis for making findings on contested issues of fact." Id. (quoting United States v. Stapleton, 268 F.3d 597, 598 (8th Cir. 2001)). "We recognize that the Sentencing Guidelines do not mandate a full evidentiary hearing when a defendant disputes a PSR's factual representation. But some investigation and verification of the disputed statements in the PSR is required." Stapleton, 268 F.3d at 598 (citation omitted). Further, the court may make "its findings with respect to the disputed [facts] based on the evidence at trial." United States v. Theimer, 557 F.3d 576, 578 (8th Cir. 2009).

At William's sentencing hearing, an officer with the Waterloo Police Department testified that Carter "had been middling crack cocaine for William Campbell a little over a year and up to four times a month and anywhere from one to four ounces each trip." R. Doc. 539, at 6. The government also called Officer Furman as a witness. Officer Furman testified that the organizational structure of the Campbell family business, ascertained via wiretapped communications, consisted of Junior and Senior "at the top" with William operating as a retail distributor to others. R. Doc. 539, at 4. Officer Furman also testified that, through wiretapped calls, investigators learned that individuals would call William to find crack cocaine.

One audio recording (a government exhibit played at William's sentencing hearing) depicted an unidentified individual calling William "looking for work." R. Doc. 539, at 4. Although this could support William's claim that he was simply a leader within a legitimate construction business, the government presented evidence disputing this claim. Government counsel asked Officer Furman, "[A]s part of this investigation, have you seen any evidence indicating that [William] was operating a construction business?" to which Officer Furman replied, "No." R. Doc. 539, at 4. Government counsel specifically asked Officer Furman whether, during

-14-

surveillance, the investigators saw William "meeting with others that looked like they were doing construction work" or "with either a vehicle or construction related items" to which Officer Furman replied, "No." R. Doc. 539, at 4. On cross-examination, defense counsel asked Officer Furman, "So when [William] talks about people working for him and talks about jobs, is that in reference to his business?" R. Doc. 539, at 5. Counsel clarified, stating, "His rehabilitation business that worked on houses and so forth." R. Doc. 539, at 5. Officer Furman responded, "We didn't see any evidence of that while we were doing the investigation." R. Doc. 539, at 5.

At trial, the government introduced as exhibits intercepted text messages between William and a supply source in Chicago, Illinois, in which William negotiated the purchase price for a pound of cocaine. Officer Furman also testified to these messages' content. Intercepted phone conversations showed that William was the supply source for Carter and others. Further, the government introduced wiretapped calls in which William used coded language to discuss "cuts" of profits between him, Junior, and Senior. This trial evidence demonstrates that William had decision-making authority in the narcotics' distribution and purchase price and that he claimed a right to a "cut" of the profits to be shared between him, his brother, and his father. It is also apparent (through William's discussions with the Chicago supplier, specifically) that he facilitated the transport of out-of-state narcotics to the Waterloo area for distribution. He then directed that distribution by employing other members of the organization—like Carter—to distribute the narcotics on his behalf. After carefully considering this evidence, we find that the district court did not clearly err in finding that William served as an organizer or leader of the organization. Gaye, 902 F.3d at 790.

Next, William argues the district court's two-level witness intimidation enhancement was unsupported by the evidence. USSG § 2D1.1(b)(16) provides, in part, "If the defendant receives an adjustment under § 3B1.1 (Aggravating Role) and the offense involved . . . witness intimidation . . . increase by 2 levels." As discussed above, William *did* receive an adjustment under § 3B1.1 and was therefore eligible for an enhancement under § 2D1.1(b)(16).

-15-

At trial, A.M. (a government witness) testified that William threatened him for wearing a wire. When cross-examined about this threat, A.M. was unable to recall the exact date of the threat but testified that it occurred sometime in 2018. William argues that A.M.'s testimony was not credible, but any assessment of a witness's credibility is within the "province of the trial court" and, on appeal, that credibility finding is "virtually unreviewable." United States v. Heath, 58 F.3d 1271, 1275 (8th Cir. 1995). The district court heard A.M.'s testimony and found it to be credible, and we do not disturb that finding. And, because the district court found that William had intimidated a witness, it did not err by applying a two-level enhancement under § 2D1.1(b)(16).

Finally, William asserts that his sentence is substantively unreasonable because the district court did not properly consider the sentencing factors under 18 U.S.C. § 3553(a). Specifically, referring to the sentence imposed on Junior and Senior, William claims the district court did not properly consider § 3553(a)(6), which requires courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

"This [C]ourt reviews the substantive reasonableness of a sentence for abuse of discretion." United States v. Funke, 846 F.3d 998, 1000 (8th Cir. 2017). A district court abuses its discretion where it "fails to consider a relevant factor that should have received significant weight"; "gives significant weight to an improper or irrelevant factor"; or "considers only the appropriate factors but in weighing them commits a clear error of judgment." Id. (quoting United States v. Farmer, 647 F.3d 1175, 1179 (8th Cir. 2011)).

While William received a four-level enhancement, Junior and Senior received a three-level enhancement and no enhancement, respectively, for their roles in the criminal activity. However, "[t]he statutory direction to avoid unwarranted disparities among defendants, 18 U.S.C. § 3553(a)(6), refers to national disparities,

-16-

not differences among co-conspirators." United States v. Pierre, 870 F.3d 845, 850 (8th Cir. 2017).

Further, any broader claim of substantive unreasonableness William presents also must fail. "Where, as here, a sentence imposed is within the advisory guideline range, we typically accord it a presumption of reasonableness." United States v. Scales, 735 F.3d 1048, 1052 (8th Cir. 2013) (quoting United States v. Deegan, 605 F.3d 625, 634 (8th Cir. 2010)). "[I]t will be the unusual case when [this Court] reverse[s] a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable." United States v. Feemster, 572 F.3d 455, 464 (8th Cir. 2009) (en banc). Further, "[t]he district court has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence," United States v. Bridges, 569 F.3d 374, 379 (8th Cir. 2009), and a defendant's disagreement with the district court's balancing of relevant considerations does not show that the court abused its discretion, United States v. Ruiz-Salazar, 785 F.3d 1270, 1273 (8th Cir. 2015).

The district court sentenced William to 360 months, and his advisory guideline range was 360 months to life imprisonment. Because the district court imposed the minimum possible sentence within William's advisory guideline range, we presume that the sentence was substantively reasonable. Scales, 735 F.3d at 1052. William presents no evidence to overcome this presumption. The court noted William's criminal history; his status as a recidivist or career offender; his threat to a co-defendant and witness; and his status as a leader, organizer, and recruiter for the organization. It opined that the mitigating factors were "far outweighed" by the aggravating factors. R. Doc. 555, at 8. It engaged in a thorough discussion of William's history and characteristics and noted his mental health issues, substance abuse issues, financial stressors, and regular gambling habits. Finally, the court— twice—*expressly* recognized the § 3553(a) factors and their application, stating first, "The Court finds no basis for a downward variance and no basis for a downward departure. I have analyzed the case using the 3553(a) factors of Title 18." R. Doc.

-17-

555, at 8. Then, later, "The 3553(a) factors of Title 18 were analyzed by this Court, remembering, of course, that I was the trial judge and I had the benefit of additional evidence at the sentencing hearing back in March." R. Doc. 555, at 8-9. Therefore, the district court did not abuse its discretion in applying the § 3553(a) factors or in imposing the within-guidelines sentence.

## B. Junior's Appeal

A jury convicted Junior of conspiracy to distribute cocaine and cocaine base (Count 1) and possession with intent to distribute cocaine (Count 14). Junior asserts four claims on appeal: (1) that the district court erred in denying his motion to suppress the wiretap evidence; (2) that the district court erred by granting the government's motion to sever; (3) that the evidence was insufficient to sustain his convictions; and (4) that the district court erred by limiting cross-examination.

### 1.

Junior first argues that the district court erred in denying his motion to suppress the wiretap evidence because the government did not properly minimize irrelevant communications. The issue of whether the government properly minimized intercepted communications "is one of fact, and we review the district court's determination under the clearly erroneous standard." United States v. O'Connell, 841 F.2d 1408, 1417 (8th Cir. 1988).

Investigators must conduct surveillance "in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). Under this statute, investigators must properly minimize communications which do not "concern the offense under investigation." United States v. Macklin, 902 F.2d 1320, 1328 (8th Cir. 1990). "This provision is nothing more than a command to limit surveillance as much as possible." United States v. Daly, 535 F.2d 434, 441 (8th Cir. 1976).

-18-

When determining whether the government complied with 18 U.S.C. § 2518(5)'s minimization mandate, we ask whether its conduct was reasonable by applying an objective reasonableness standard. Id. Our inquiry looks to several factors, including the criminal activity's scope, the investigating agents' reasonable expectations of the communications' content, the authorizing judge's continuing judicial supervision, the communications' length and origin, and whether the speakers relied on coded or ambiguous language. Macklin, 902 F.2d at 1328; see also Daly, 535 F.2d at 441-42.[4] In Scott v. United States, 436 U.S. 128, 139-40 (1978), the Supreme Court emphasized the flexibility of this inquiry:

> Because of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case. The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to "minimize" the interception of such conversations. Whether the agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case.

Here, the district court included in its wiretap order instructions to investigators to minimize the number of communications intercepted that did not relate to the investigation. Officer Furman testified that, to comply with the court's minimization instructions, the AUSA created a team of investigators responsible for minimization. This minimization team was responsible for monitoring the voice and text communications from the target cell phones, and no investigator could participate as a member of this team until receiving these instructions. This team intercepted phone calls in real time and determined their relevance; it ceased listening to and recording irrelevant calls. When the team believed a call *might* be relevant, it would forward that call to the drug task force which would then listen and independently determine its relevance. If a drug task force investigator deemed the call irrelevant, the investigator would stop listening to the call and instead

---

[4]In Daly, we explained that although these factors are instructive, "[w]e do not imply that a trial or reviewing court should not consider other factors in cases presenting different circumstances." 535 F.2d at 441.

-19-

intermittently spot check the call to determine whether the call had become relevant. The minimization team also employed procedures specific to their interception of text communications: if the team found that an intercepted text message was irrelevant to the investigation, it did not forward that message to drug task force investigators.

After reviewing this record, we agree with the district court that the government properly complied with 18 U.S.C. § 2518(5)'s minimization mandate. The surveilled criminal activity was expansive, stretching from April 2015 to March 2017, involving multiple individuals and numerous drug transactions. Drug task force agents were not privy to irrelevant communications except for those that they spot-checked. In Daly, this Court found that investigators substantially complied with § 2518 where their only exposure to irrelevant communications was through spot-checking. 535 F.2d at 441-42 ("We recognize that monitoring agents are not gifted with prescience. . . . Because even innocent conversations often times turn to criminal matters, spot-checking of such conversations is permissible especially in a case such as this involving a broad scope of criminal activity and a sophisticated criminal element." (citation omitted)). Additionally, the district court was apprised of the investigation and its minimization: The government asked for an extension of the court's wiretap order four times and each time presented evidence of the communications that they had intercepted. These minimization techniques were objectively reasonable, and because of this, the district court did not err in denying Junior's motion to suppress.

2.

Junior next argues that the district court erred by granting the government's motion to sever the trial of co-defendants J.P. and Carter from that of Junior and the other defendants because it did so only one month prior to the scheduled trial date and because the government did not show that actual prejudice, sufficient to outweigh the strong preference for a joint trial, would occur absent severance. Rule 14 of the Federal Rules of Criminal Procedure permits severance of defendants'

trials where the moving party would be prejudiced by a joint trial. "The general rule is that persons charged in a conspiracy should be tried together, particularly where proof of the charges against the defendants is based upon the same evidence and acts." United States v. Lee, 743 F.2d 1240, 1248 (8th Cir. 1984). However, "[a] motion to sever rests within a district court's sound discretion, and we will not reverse that decision absent a showing of clear prejudice indicating an abuse of discretion." United States v. Garcia, 785 F.2d 214, 220 (8th Cir. 1986).

The government argued that it would incur prejudice if J.P. and Carter were tried with the other defendants. J.P.'s and Carter's statements implicated Junior, Senior, and William, and because Junior, Senior, and William would not have been able to cross-examine J.P. and Carter—their co-defendants—the statements could not have been admitted in full. Further, the government argued, the statements could not have been redacted in a way that would have comported with the standard set out in Bruton v. United States, 391 U.S. 123 (1968). Because the statements were important in proving that a conspiracy existed, the government argued, severance was necessary.

In Bruton, the Supreme Court demarcated the proper function of limiting instructions in joint trials, explaining that even "clear" instructions are not "adequate substitute[s]" for a defendant's right to cross-examination. Id. at 137. The Eighth Circuit later explained:

> [A] defendant's constitutional rights are violated when the court admits the out-of-court statements of a codefendant, which, "despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial."

United States v. Gayekpar, 678 F.3d 629, 636-37 (8th Cir. 2012) (quoting Gray v. Maryland, 523 U.S. 185, 196 (1998)); see also United States v. Long, 900 F.2d 1270, 1280 (8th Cir. 1990) ("We [have] distinguished cases where presentation of the

redacted statement draws the jury's attention to the fact that a name was omitted and invites the jury to fill in the blank, and cases where the redacted statement does not invite speculation.").

J.P. and Carter both gave detailed statements to Waterloo police. After Carter was arrested, he stated that he did not sell drugs but acted as a middleman, delivering cocaine from a distributor (who he then identified as "T.R.") to retail-level dealers. R. Doc. 191, at 3. However, in a later proffer interview, Carter identified William as his distributor. In his interview, Carter characterized the Campbell family as a major source of cocaine in the Waterloo area and stated that Senior had provided him with "a lot" of cocaine. R. Doc. 191, at 3. After J.P. was arrested, he made post-Miranda[5] statements to Waterloo police, admitting his involvement in a drug-trafficking organization and naming some of his suppliers and customers. R. Doc. 191, at 3. He then worked as a cooperator for the government and made several controlled payments to Junior to pay off his drug debts. In a proffer interview, J.P. named Junior, Senior, and William as members of the organization, stated that he had first discussed joining the organization with Junior, and described purchasing large amounts of cocaine from Junior on several occasions (which he then distributed for retail sale). R. Doc. 191, at 4.

The district court was tasked with deciding whether the government could redact J.P.'s and Carter's statements in a way that would not "invite[] the jury to fill in the blank" or "invite speculation." Long, 900 F.2d at 1280. The court found that the statements "[could not] be sufficiently redacted to comply with the dictates of Bruton without substantially compromising their evidentiary value." R. Doc. 191, at 5. We agree. J.P.'s and Carter's statements were crucial to the government's case because those statements were strong evidence of the men's involvement in the larger conspiracy. Even when redacted, Carter's description of a family prominent in the Waterloo drug trade and J.P.'s description of his supplier and the controlled payments he made to that supplier would "invite[] the jury to fill in the blank" in

---

[5]Miranda v. Arizona, 384 U.S. 436 (1966).

violation of Bruton. Long, 900 F.2d at 1280. As the district court explained: "The statements would inevitably 'le[ad] the jury straight to' the other Defendants. The government would be forced to omit them entirely to avoid running afoul of Bruton. The inability to use the statements, however, would be a substantial blow to the government's case, creating severe prejudice." R. Doc. 191, at 5-6 (alteration in original) (citation omitted). The government met its burden of establishing that it would suffer prejudice if the severance was not granted. Therefore, we affirm the district court's severance of J.P. and Carter from Junior and the other defendants for trial.

3.

Junior also contends that there was insufficient evidence to sustain his convictions for conspiracy to distribute cocaine and cocaine base and possession with intent to distribute cocaine. At the conclusion of trial, Junior moved for judgment of acquittal or in the alternative, a new trial. We therefore "review the sufficiency of the evidence to sustain [this] conviction de novo, viewing the evidence in the light most favorable to the jury's verdict and reversing only [where] no reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Ramos, 852 F.3d 747, 753 (8th Cir. 2017) (citation omitted). After reviewing the record, we find that there was sufficient evidence to sustain Junior's convictions.

On appeal, Junior argues that the government failed to present evidence that he was knowingly involved in a conspiracy to distribute cocaine and cocaine base. "To establish that a defendant conspired to distribute drugs, the government must show that there was an agreement to distribute drugs, that the defendant knew of the conspiracy, and that the defendant intentionally joined the conspiracy." United States v. Davis, 826 F.3d 1078, 1081 (8th Cir. 2016). "The government [does] not need to show a formal agreement; showing a tacit agreement by understanding proven wholly by circumstantial evidence or by inferences from the parties' actions is sufficient." United States v. Casas, 999 F.2d 1225, 1229 (8th Cir. 1993) (quoting

-23-

United States v. Searing, 984 F.2d 960, 964 (8th Cir. 1993)).  Merely showing the defendants' knowledge of the conspiracy is insufficient, however; instead, the government must establish "knowing involvement and cooperation." Id.

Three different cooperators, who later testified at trial, arranged to purchase cocaine from Junior.  J.P. made four controlled cash payments to Junior, which were each captured on an audio recording device and later played at trial, and at trial, J.P. testified that these payments were reimbursements for narcotics that Junior had advanced to J.P. for retail sale.  N.S. testified that he purchased cocaine and cocaine base from Junior on multiple occasions.  Finally, A.M. testified that he observed Junior delivering a kilogram of cocaine to another retail dealer.  When testifying about the government's wiretap of Junior's phone, Officer Furman stated that Junior spoke in coded language—frequently used by narcotics traffickers—when speaking to co-defendants William and Senior.  Additionally, this wiretap revealed Junior's conversations with a narcotics supplier in Texas.   In these intercepted communications, Junior discussed sending $63,000 to the Texas supplier for cocaine.  Junior then met with an associate assigned to transport money to Texas. Officers stopped this associate and, after searching her car, seized $19,600 in cash. Investigators later intercepted communications between Junior and the Texas supplier in which they discussed the loss of this seized cash.  Finally, after executing several search warrants on Junior's residence and Junior's storage unit, officers recovered firearms; ammunition; equipment to convert cocaine into cocaine base with cocaine residue on it; materials for packaging cocaine for retail sale and chemicals commonly used as cocaine cutting agents; and a coffee can with a false bottom containing approximately 37 grams of cocaine base, four grams of powder cocaine, and cutting agents.

We have explained that a jury's determination of witness credibility should not be disturbed absent a showing that the testimony was implausible on its face. See Ramos, 852 F.3d at 753 ("[A]ccomplice testimony need not be corroborated to support a conviction.  Unless the testimony is implausible on its face . . . we defer to the jury's determination of whether an accomplice is credible." (citation omitted));

see also United States v. Mallett, 751 F.3d 907, 916 (8th Cir. 2014) ("'[W]e do not consider attacks on witnesses' credibility when we are evaluating an appeal based upon the sufficiency of evidence.' And '[w]e have repeatedly upheld jury verdicts based solely on the testimony of co-conspirators and cooperating witnesses, noting that it is within the province of the jury to make credibility assessments and resolve conflicting testimony.'" (second alteration in the original) (citations omitted)). Junior presents no evidence that the cooperators' testimony was implausible on its face, and we therefore defer to the jury's determination of credibility.

As to Junior's possession conviction, he claims that the government failed to produce sufficient evidence of his knowledge of the controlled substance to support a theory of constructive possession. Specifically, Junior asserts that the government failed to present evidence that he knew of the coffee can (with a false bottom containing approximately 37 grams of cocaine base, 4 grams of powder cocaine, and cutting agents) or that he used the storage unit from which officers seized the can.

Constructive possession exists where a person has knowledge of the presence of contraband and control over that contraband. United States v. Wright, 739 F.3d 1160, 1168 (8th Cir. 2014). "Evidence showing a person has 'dominion over the premises in which the contraband is concealed' establishes constructive possession." Id. (quoting United States v. Ojeda, 23 F.3d 1473, 1475 (8th Cir. 1994)). At trial, the government presented evidence that Junior had rented the storage unit, that officers found mail addressed to Junior inside the unit, and that officers found a receipt for the unit in Junior's residence. Further, one of Junior's own witnesses testified that she gave Junior the coffee can. Finally, the cutting agents found in the can's false bottom were the same kind of cutting agents recovered from the search of Junior's residence. In light of this evidence, we cannot say that no reasonable jury could find Junior guilty under a theory of constructive possession. Ramos, 852 F.3d at 753. Therefore, after reviewing the government's evidence presented, we conclude that Junior's convictions are supported by sufficient evidence.

4.

Finally, Junior claims that the district court erred by limiting cross-examination of the government's cooperating witnesses. For the reasons discussed above, see supra Section II.A.2, we find that the district court did not err.

C. Carter's Appeal

A jury convicted Carter of conspiracy to distribute cocaine and cocaine base (Count 1) and possession with intent to distribute cocaine base (Count 13). Carter presents three claims on appeal: (1) the district court erred by denying his request for a buyer-seller instruction; (2) there was insufficient evidence to sustain his convictions; and (3) his sentence is substantively unreasonable.

1.

First, Carter claims that the district court erred by denying his request for a buyer-seller jury instruction because, contrary to the government's theory, only a buyer-seller relationship existed between him and the Campbell family. As explained above, see supra Section II.A.3, we apply a de novo standard where the district court's refusal of a proffered jury instruction simultaneously denies a legal defense. Bruguier, 735 F.3d at 757. After reviewing de novo the government's evidence, we find that the district court did not err in denying Carter's request for a buyer-seller instruction.

This Court recently emphasized that a buyer-seller instruction is only appropriate in limited circumstances. See United States v. Harris, 966 F.3d 755, 761 (8th Cir. 2020) ("But we have emphasized that such buyer-seller cases involve only evidence of a single transient sales agreement and small amounts of drugs consistent with personal use." (quoting United States v. Shelledy, 961 F.3d 1014, 1019 (8th Cir. 2020)). Where there is evidence that a defendant engaged in multiple sales of large quantities of narcotics, a buyer-seller instruction is inappropriate. Id.; see also

United States v. Conway, 754 F.3d 580, 592 (8th Cir. 2014) ("Where the conspiracy involves large quantities of drugs and significant interaction between dealers and users over an extended period of time, the instruction is inappropriate.").

In January 2017, law enforcement conducted a traffic stop of Carter after he left William's residence. During that stop, officers seized 12.94 grams of crack cocaine; a government witness testified at trial that this amount of cocaine is not consistent with a drug-user but rather, a drug-trafficker "just by the sheer volume of it." R. Doc. 549, at 107-108. Further, at Carter's trial, the government presented a cooperating witness who testified that he first bought crack cocaine from Carter in 2015 or 2016 and continued buying from him until Carter's 2017 traffic stop and arrest. The witness explained that he purchased crack cocaine from Carter almost every day—sometimes twice a day. That witness further testified that Carter acted as a middleman: Carter obtained cocaine from William, which he then sold to the witness. The government also presented an investigator who testified that a search of Carter's residence uncovered items consistent with drug trafficking: a scale and a large number of baggies. Most telling, perhaps, is the multitude of phone conversations and text messages exchanged between Carter and William and introduced by the government at trial: in them, the two men discussed the availability of cocaine; disruptions in the narcotics supply chain; a third, unidentified person who owed Carter money; and William offering Carter a decreased price because of his bulk cocaine purchase. Further, these exhibits revealed that Carter had his own customers.

This evidence does not support a buyer-seller instruction. Instead, the evidence portrays multiple drug sales spanning an extended period of time and involving multiple transactions of drug amounts much larger than those required for personal use. Harris, 966 F.3d at 761; Conway, 754 F.3d at 592. Carter maintains that the 93 text messages and 92 phone calls exchanged between him and the Campbells and intercepted via wiretap were not indicative of his involvement in the conspiracy, but rather, were indicative of his familial relationship to the Campbell family: one of Carter's children is married to one of the Campbell children.

However, the phone calls and text messages introduced do not support this claim because, in each, the two men discuss narcotics sales. However, even if we assume that Carter is correct, a buyer-seller instruction would still be inappropriate in light of the other evidence presented at trial. Therefore, we find that the district court did not err in denying a buyer-seller instruction.

2.

Carter next alleges that there was insufficient evidence to support his convictions for conspiracy to distribute cocaine and cocaine base and possession with intent to distribute cocaine base. Because Carter did not move for acquittal at the close of the government's case, at the close of all evidence, or after the jury's verdict, "we reverse only if the district court, in not *sua sponte* granting judgment of acquittal, committed plain error." United States v. Calhoun, 721 F.3d 596, 600 (8th Cir. 2013). Plain error only exists where the district court's error affected the defendant's substantial rights and "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." Id.

Carter cannot meet that high standard here. The government "must [only] show that there was an agreement to distribute drugs, that the defendant knew of the conspiracy, and that the defendant intentionally joined the conspiracy." Davis, 826 F.3d at 1081. As we explained supra Section II.B.3, the government need not show a formal agreement to sustain a conspiracy conviction. Casas, 999 F.2d at 1229. Carter argues that the evidence was insufficient to support a conspiracy conviction because only a buyer-seller relationship existed between him and the Campbells. However, as we discussed above, see supra Section II.C.1, the evidence supports the finding that his relationship with the Campbells exceeded that of a buyer-seller, and therefore, this argument fails.

Further, Carter argues that the government's evidence was insufficient to support his conviction for possession with intent to distribute cocaine base. To convict a defendant of possession with intent to distribute a controlled substance, the

government must prove beyond a reasonable doubt that the defendant "both knowingly possessed and intended to distribute the drugs." United States v. Morales, 813 F.3d 1058, 1065 (8th Cir. 2016) (citation omitted). When explaining why the evidence was insufficient to support his conviction for possession with intent to distribute cocaine base, Carter simply argues that evidence presented at trial on Count 13 is "inextricably intertwined" with the evidence for Count 1. Again, because his relationship with the Campbells was much more extensive than that of a buyer-seller, this argument fails. We conclude that the evidence was sufficient to support Carter's conviction.

3.

Finally, Carter argues that his sentence is substantively unreasonable. Specifically, Carter argues that the district court erred in denying his motion for a downward variance and that the court failed to adequately consider mitigating factors. As explained above, see supra Section II.A.4, we review substantive reasonableness under an abuse of discretion standard. Funke, 846 F.3d at 1000.

The district court sentenced Carter to a within-guidelines sentence of 360 months. Because this sentence is within the advisory guideline range, we presume it to be reasonable. Scales, 735 F.3d at 1052. Carter alleges the district court did not adequately consider mitigating factors and, as a result, incorrectly denied Carter's motion for a downward variance. However, the district court specifically explained that a downward variance was inappropriate because the "aggravating factors far outweigh[ed] the mitigating factors." R. Doc. 565, at 12. The district court looked at Carter's "many" state court drug convictions and noted that he is a "recidivist drug dealer." R. Doc. 565, at 12. Carter suggests that the court did not consider his battle with substance abuse issues, but the court noted its "hope" that Carter would request assistance with his "serious substance abuse history." R. Doc. 565, at 13. As we have previously explained, "[s]imply because the district court weighed relevant factors . . . more heavily than [the defendant] would prefer does

not mean the district court abused its discretion." Farmer, 647 F.3d at 1179. The district court exercised its wide latitude, Goodson, 569 F.3d at 379, and found that 360 months was appropriate after "considering each and every factor under 18 United States Code Section 3553(a)," R. Doc. 565, at 13. We conclude that the district court did not abuse its discretion in sentencing Carter.

## D. Senior's Appeal

A jury convicted Senior of conspiracy to distribute cocaine and cocaine base (Count 1) and distribution of cocaine base (Count 3). Senior asks this Court to consider three contentions on appeal. First, he contends the district court erred in denying his requests for a multiple conspiracies and a buyer-seller instruction. Second, he argues there was insufficient evidence to support his convictions. Finally, Senior claims the district court erred in denying his motion for a new trial.

## 1.

First, Senior argues the district court erred in denying his requests for a multiple conspiracies jury instruction and for a buyer-seller jury instruction. Because above, see supra Sections II.A.3 and II.C.1, we discussed the applicable law in great detail, we do not engage in that analysis again, here. Rather, we look only to the facts unique to Senior's trial, applying de novo review. Bruguier, 735 F.3d at 757.

Like William, Senior argues that N.S.'s testimony evidences a separate conspiracy between N.S. and Junior. Again, we disagree. At trial, the government presented robust evidence indicating that Senior was a member of the same conspiracy as N.S. and Junior. A cooperator for the Waterloo police, using a cooperating witness and $200 of preserialized bills, purchased cocaine base from Senior while wearing a recording device. At trial, that cooperator identified Senior as the supplier who sold cocaine base to him during the controlled buy. A different cooperator testified that he had observed Senior and Junior delivering a kilogram of

-30-

cocaine to another member of the organization. Further, wiretap evidence revealed that Senior was aware that he was under investigation; during intercepted communications between Junior and Senior, the two men referred to the "task" and its surveillance of Junior. The nature of Senior's activities—i.e., the sale of cocaine and cocaine base—are identical to that of the other co-conspirators charged. Like N.S., Junior, William, and Carter, Senior operated within the Waterloo area. Further, he frequently communicated—*in coded language*—with the other conspirators. Because the nature of his activities, the location in which he operated, and the identity of the persons involved are virtually identical to that in Junior's case, the evidence supports the government's single-conspiracy theory.

Senior also claims that he and N.S. did not know one another. Even if this is true, it does not defeat the government's single conspiracy theory. "Furthermore, '[a] conspirator . . . need not know all of the conspirators or be aware of all the details of the conspiracy, so long as the evidence is sufficient to show knowing contribution to the furtherance of the conspiracy.'" United States v. Johnson, 719 F.3d 660, 666 (8th Cir. 2013) (alterations in original) (citation omitted); see also United States v. Benford, 360 F.3d 913, 914 (8th Cir. 2004) ("A single conspiracy may exist even if the participants and their activities change over time, and *even if many participants are unaware of, or uninvolved in, some of the transactions.*" (emphasis added)). Therefore, we affirm the district court's denial of Senior's request for a multiple conspiracies instruction. Additionally, because the evidence evinces Senior's role— one involving multiple transactions and a large quantity of narcotics sold—a buyer-seller instruction was also inappropriate, and the district court did not err in denying the proffered instruction. Harris, 966 F.3d at 761.

2.

Senior next argues that the evidence presented at trial was insufficient to support his convictions for conspiracy to distribute cocaine and cocaine base and distribution of cocaine base. Senior moved for acquittal after the close of the government's evidence—and renewed that motion at the close of Junior's

evidence—but the district court denied it. We therefore conduct de novo review. Ramos, 852 F.3d at 753.

We have previously discussed the government's burden to sustain a conspiracy conviction, supra Section II.B.3, and we do not reiterate that here. To sustain a conviction for the distribution of a controlled substance, the government must prove beyond a reasonable doubt that the defendant "intentionally transferred cocaine base to another person" and that, at the time of the transfer, the defendant knew he was dealing a controlled substance. See, e.g., United States v. Thompson, 686 F.3d 575, 582 (8th Cir. 2012).

Senior claims that because the controlled buy, previously discussed supra Section II.D.1, was not observed, videoed, or photographed, and because the preserialized money was never recovered, it cannot support his convictions. We disagree. Although officers observed the wrong car during the controlled buy, the cooperator wore an audio recording device, an officer testified at trial that the voice on the recording was that of Senior, and the cooperator who participated in the buy also identified Senior (at trial) as the supplier during that buy.

Senior also challenges the credibility of the government's witnesses. For example, he challenges Officer Furman's credibility and asserts Officer Furman's interpretation of Senior, Junior, and William's coded language is "speculative." However, as we discussed supra Section II.B.3, we do not consider attacks on witness credibility when evaluating the sufficiency of the evidence, and the jury's credibility determinations of cooperating witnesses will not be disturbed absent evidence that the testimony was implausible on its face. Mallett, 751 F.3d at 916; Ramos, 852 F.3d at 753. Senior presents no evidence indicating that the cooperator's testimony was implausible on its face, and therefore, we leave the jury's credibility determination undisturbed. Further, the abundance of evidence against Senior, which we outlined in our discussion of the district court's denial of Senior's requested multiple conspiracies instruction, is also relevant here. See supra Section

-32-

II.D.1. After reviewing the record, we find that the government presented sufficient evidence to support Senior's conspiracy and distribution convictions.

3.

Finally, Senior argues that the district court erred in denying his motion for a new trial. "We review the denial of a motion for a new trial for an abuse of discretion." Southland Metals, Inc. v. Am. Castings, LLC, 800 F.3d 452, 461 (8th Cir. 2015). In light of our finding that there was sufficient evidence to sustain Senior's convictions, supra Section II.D.2, we similarly find that the district court did not abuse its discretion in denying Senior's motion for a new trial.

III.

For the above-stated reasons, we affirm the district court in full.

_____